WILLIAM DECKER and others, appellants,

and

ELISHA RUCKMAN, respondent.

1. An appeal from a final decree brings before the appellate court all interlocutory orders and decrees involving the merits, as well as the master's report, together with the evidence upon which they are founded.

2. Orders and decrees relative to pleadings and adjudications merely incidental to the suit and not affecting the merits, are, under the one hundred and fourteenth section of the chancery act, conclusive, except when appealed from within forty days.

---

On appeal from final decree of the chancellor.

The opinion of Chancellor Zabriskie is reported in *Ruckman* v. *Decker*, 8 *C. E. Gr.* 283. See, also, *S. C., supra p.* 5.

*Mr. Barker Gummere,* for appellants.

*Mr. J. Vanatta,* for respondents.

Decker *v.* Ruckman.

The opinion of the court was delivered by

KNAPP, J.

By an interlocutory decree made on February 13th, 1873, in this cause, it was ordered that the defendants should account to the complainants for, and pay to him, one-half the value of certain oysters in the decree mentioned, with lawful interest thereon, and directed a reference to a master to ascertain that value and interest. In pursuance of such direction, the master took testimony and made his report that there was due from defendants to the complainant, on the 1st of December, 1874, the sum of $34,763.80. The decree confirming this report was entered on the 12th of April, 1876. From this final decree appeal is taken. The first question mooted on the argument was, as to the scope of the investigation permitted upon the hearing of this appeal. Attention was called to the one hundred and fourteenth section of the chancery act (*Rev. p.* 125), the language of which is:

"All appeals, except from final decrees, shall be made within forty days after filing the order or decree appealed from, and all appeals from final decrees of the said court shall be made within three years after making such decree; provided, that in all cases where the person entitled to such appeal from any *final decree* be an infant, *feme covert,* or insane, he shall have three years to bring such appeal after such disability shall be removed."

The argument is, that no appeal having been taken from the interlocutory decree within the forty days, that decree has become a finality, and is not the subject of review upon this appeal.

But neither the plain reason of the enactment nor the previous cases construing it, will allow us to give it this operation. The sole purpose of the clause is to prevent delays in the progress of the cause in the court of chancery. Therefore, all orders and decrees relative to pleadings, and all adjudications merely incidental to the suit which, do not

affect the merits of the case, are conclusively settled by an interlocutory decree which is not appealed from within the prescribed period. But as to all decrees and orders affecting the merits of the case, the act does not apply.

Every adjudication which involves the merits and the law applicable thereto is the substructure of the final decree. As such they are reviewable whenever the latter is brought before the court on appeal.

Any other construction of the act would, by its terms, place the class of persons whose rights the proviso is designed to protect, without any shield, in every case where the most important questions affecting those rights are settled by an interlocutory decree. Infancy, insanity or coverture is no excuse for a failure to take appeal in those instances where it must be prosecuted within forty days. While, by the terms of the act, time shall not run against persons under such disability, as to their right to appeal from a final decree, it must be apparent that there can be no intent to give them an appeal from final decree upon their gaining a status, and upon such appeal to shut out inquiry touching earlier orders and decrees in the cause by which their substantial rights have been determined.

This is the view which has been held by this court in previous cases. In *Terhune* v. *Colton*, 1 *Beas.* 312, Judge Elmer said: "I am inclined to think that when the final decree involves the merits of the case, which have previously been settled by an interlocutory decree, an appeal from the final decree, properly taken, brings the whole case before the court."

This view was subsequently adopted in the case of *Crane* v. *DeCamp*, 7 *C. E. Gr.* 614. In that case there was an interlocutory decree, a reference to a master, his report of a sum due; the report was confirmed, and no appeal was taken from the interlocutory decree. It was held that the appeal from the final decree brought the whole case before the appellate court.

The distinction between the decrees which are and those which are not of a character to incorporate themselves in the final decree as involving meritorious questions, is discussed somewhat in *Butterfield* v. *Third Avenue Savings Bank*, 10 *C. E. Gr.* 535. In that case it was held that a refusal of the chancellor to allow an amendment to a pleading was within the class of orders which must be appealed within the forty days.

No exceptions were filed to the master's report in this case. But if the decree of February, 1873, which referred to the master the question of value of the property, is open to inquiry, any change which this court may make in the determination of quantity of property charged against defendants, leads, necessarily, to a review of the master's report. I think it is clear that the interlocutory decree, the report of the master, and the testimony upon which they were severally made, is now before the court upon this appeal from the decree of April, 1876.

It is again insisted that the appellants have no right to prosecute this appeal, because they did not appear and resist the final decree. The final decree was entered upon the coming in of the master's report, notice having been given, and no exceptions filed. The entry of the decree was irregular, because the interlocutory decree reserved further directions and equity until the coming in of the master's report. *Ruckman* v. *Decker, supra p.* 5. The case ought to have been set down for hearing upon the equity reserved. Although the chancellor held, on motion to set aside the decree as improvidently entered, that the irregularity was waived by the defendants, by reason of their application for an order to stay execution, and subsequent appeal to this court and stay here granted, I do not think the irregularity is waived so as to defeat their right of appeal.

If the cause had been regularly set down for hearing, and noticed for argument, a failure to appear would have placed the appellants in the position of the parties in *Townsend* v.

*Smith*, 1 *Beas.* 350, upon the ground that if the defendant voluntarily absents himself from the hearing, it may fairly be presumed that no defence is insisted on. But there is no indication of a waiver of defence by the acts of the defendants here.

The chancellor might well hold that by the subsequent conduct of the appellants, among them the taking of this appeal and application here for a stay of execution on the decree, they waived the objection that the decree was improvidently entered, but it cannot be inferred from the taking of an appeal that the appellants acquiesce in the decree itself. It is clear that the defendants intended to contest it, and that they have a standing in this court for that purpose.

This brings us to the questions involved in the cause itself.

The defendants raised the question of the complainant's right to plant oysters in the tide-waters of the state of Virginia, and of his title to the oysters so planted. If it be conceded that Wilson and Ruckman had not the legal right to plant as they did, and that in so planting they, as to strangers, lost their right to the property, Wilson having taken them up and regained their possession, cannot gainsay the rights of his partner. When the property came to his hands the right of the complainant in them attached.

It was also urged that the partnership between Wilson and Ruckman was formed in fraud of the law of a sister state, and that, under such partnership arrangement, Ruckman acquired no rights which courts will enforce. It is a sufficient answer to this to say that this case does not disclose what are the laws of Virginia which are said to have been violated, they not being proved in the case, and, consequently, the matter is not before us.

We may turn, now, to the matters of substance between the parties. The learned chancellor, in deciding the merits of the cause upon the testimony before him, charged the defendants with having received, of the common property of Wilson and Ruckman, from their beds in front of the Wilson

Decker *v.* Ruckman.

farm, on the Nansemond river, in Virginia, 5,000 bushels of oysters in 1857-8, 25,000 bushels in 1858-9, and 12,800 bushels in 1859-60, in all, 42,800 bushels, as having been received by the Deckers on their vessels during those years. The recovery was limited to that period, because the evidence showed that the oysters of Wilson and Ruckman were planted on the. beds before 1857, and further showed that oysters planted before 1857 would perish or disappear after 1860.

The chancellor, in speaking of the evidence upon which he was obliged to decide the questions of ownership and quantities of oysters taken, was. constrained to remark upon its vague and unsatisfactory character. The burden of proving the complainant's claim is, beyond question, cast upon him ; and, although the volume of testimony is large, that part of it which relates to the quantity of property taken, upon which you can rely for a determination having any reasonable approach to exactness, is very small. Roff, a witness upon whose testimony alone the defendants are charged with 37,000 bushels in this account, in speaking of the cargoes brought by him from the Nansemond river in the "Butler," says : "I ran from there *five or six* times the first winter (1857–58); *almost* every trip we would take a *part of a load* from the river in front of the farm; sometimes a whole load; the 'Butler' would turn out *about* 2,000 bushels a load, New York measure." On this testimony the defendants were charged with the half of five boat-loads, of 2,000 bushels each, for that year, or 5,000 bushels. A part of almost every one of five or six loads of a vessel of about 2,000 bushels carrying capacity; and sometimes a whole load, cannot be found to equal 5,000 bushels, without the aid of conjecture. If it be conceded that on this evidence one-half of five cargoes was the proper quantity to be charged, and that they were from the Wilson beds, the testimony of Latourette and Joline, two of complainant's witnesses, shows the capacity of the vessel to be overstated. The former, who built and owned the vessel, and

carried many oysters in her, says she carried from 1,700 to 1,900 bushels; the latter, Joline, who afterward sailed the "Butler," placed her capacity at 1,500 or 1,600 bushels; and the chancellor found the half load carried in her in 1859–60, and for which he charged defendants, to be 800 bushels, or 1,600 as her whole load. With due regard to certainty in proof, the latter figure is the largest that should be taken to express her burthen. The quantity allowed for that year would, by that, suffer a reduction of 1,000 bushels.

For the winter of 1858–59, defendants are charged with receiving 25,000 bushels of oysters; one-fifth of these were carried in the "Caroline Coles," and I think that the evidence may be said fairly to support this part of the claim; the remaining 20,000 are allowed for the cargoes of the "Aiken," a vessel of which Roff was master in that and the two succeeding years. And Roff's testimony is all that we have to aid us. The "Aiken" is shown to have a carrying capacity of 4,000 bushels, and Roff testified that he carried five or seven loads in her during that winter. The allowance against the defendants is for five loads of 4,000 bushels each, for that year. I think it is not correctly inferred, from the testimony of Roff, that the five loads were entirely from in front of the Wilson farm. He certainly does not say so, and, from what he says in immediate connection with that testimony, viz., that he was in the "Aiken" three winters, and carried ten loads in her in the three winters, it is the more reasonable inference that, in speaking of the five loads carried in that season, he spoke of loads made up from both the Decker and Wilson beds, and not from the Wilson beds alone. This becomes more apparent when Roff, in speaking of the Wilson beds, and summing up all the oysters carried from those beds in the "Aiken" in the three successive winters during which he was her master, put the amount as seven full loads from in front of the Wilson farm. I think the most favorable view of the evidence for the complainant that is admissible would be to allow to him, as taken from the Wilson beds, such proportion of the five loads as the

Decker *v.* Ruckman.

quantity taken from in front of the Wilson bed by the "Aiken," in the three years, bears to the whole quantity carried in her in that time from both beds. This method of computation would allow the defendants to be charged with having received seven-tenths of the five loads, or 14,000 bushels out of the common property of Wilson and Ruckman—resulting in a reduction of the quantity decreed for that year of 6,000 bushels.

For the year 1859–60, 12,800 bushels are charged against the defendants. At this time, as I think the testimony clearly shows, the defendants, or Wilson on their account, had purchased and deposited upon beds in front of the Wilson farm large quantities of oysters; some planted for growth, and other large quantities ready for market, were dumped on some parts of these beds awaiting the arrival of vessels to transport them to the Deckers, in New York. It is entirely consistent with all the evidence in the case, that oysters taken in the " Decker" and " Aiken " by Roff, and in the " Butler" by Joline, for that year, were the oysters of Deckers, and not of Wilson and Ruckman. The chancellor held the defendants for all the oysters taken that year, mainly on the ground that the defendants, by Wilson, their partner, or their agents, had mingled their property with that of Wilson and complainant, so that they were not distinguishable or capable of separation. There is no question to be made of the correctness of the rule applied by the chancellor. The serious doubt here is, whether the evidence justified its application in this case. The oyster ground in front of the Wilson farm comprises about eighty acres. The evidence does not show, nor is it claimed, that all of this ground, or any very considerable part of it, was planted by Ruckman and Wilson. Johnson, a witness in the cause, who seems to have been employed by Wilson and Ruckman in taking oversight of and working on these oyster beds, and Benjamin N. Johnson, who saw deposits made of oysters, for the Deckers, in 1869, say that at that time nearly or quite all the oyster beds of Ruckman had been cleaned

up.  It is said that the tract was so large he might not have
known of all the beds.  But if there were others upon which
the defendants might unwittingly have placed their oysters,
and thus mixed them with the complainant's property, this
should have been shown by testimony.  Not only should it
have appeared that Ruckman and Wilson had an appreciable
quantity on the beds of this tract, but it should have been
shown that the defendants' property was so deposited that it
became mixed with the complainant's.  Unless complain-
ant's property extended over the whole of the tract, which
is far from appearing, it was entirely possible that property
of defendants, of this character, could be deposited on the
tract without admixture or confusion.

View the testimony in the best light possible for the com-
plainant, we have only the facts that Mr. Ruckman had
oysters on some part of a tract of land, under water, eighty
acres in extent, and that Wilson put some oysters on some
part of the same tract.  This affords no proof of mixture.
The mixture should have been shown, to make the rule
available for the complainant.  The only direct testimony I
find upon the point is that of Benjamin N. Johnson, and
that, so far as it extends, rebuts the idea of a mixture.  I
think there is a want of satisfactory proof that any of the
oysters shown to have been received from the Nansemond
beds in 1859–60, by the Deckers, were the property of Wil-
son and Ruckman.  And the testimony of John Merell, a
witness who could speak with knowledge of the facts, says
that he saw some of the oysters which were sent to the
Deckers in 1859–60, in the "Decker" and "Aikin," loaded
from the Wilson farm, and that they were the same depos-
ited there by the Deckers.

The 12,800 bushels should be disallowed for want of suffi-
cient evidence to sustain the claim.

The foregoing treatment of the evidence results in the
ascertainment of 23,000 bushels of oysters as the quantity
received by the defendants as the joint property of Ruck-
man and Wilson—the one-half of which, being the share of

Decker *v.* Ruckman.

the complainant, they should be charged with, at such price as the evidence, taken upon the question of value, shows them to have been worth, lying upon the beds at the time when they were taken, with a proper allowance for interest.

I shall not refer, in detail, to the testimony before the master, but I have carefully examined it, and am satisfied that a large reduction must be made from the allowance reported by the master. He seems to have taken the highest price at which any of these oysters are said to have been sold in New York, and deducted from that the cost of freight, and charged the defendants with the balance — in effect charging upon the oysters in the beds the risks of the venture and profits of the final sale. This was not in accordance with the decretal order referring to him the question of values. He was required to ascertain their value, lying in the beds. I do not find it necessary, as the master has done, to fix different prices for different grades. There is evidence showing different values for large or small oysters, but nothing, as I understand the evidence, showing different values for the same quantity in bulk, as these are charged. The bulk of the complainant's testimony is upon values in New York. A number of witnesses for defendants, and a few for complainant, speak of the price at which they could be purchased, raised and put alongside of vessels ready to receive them in the river. The witnesses are, mostly, men who are, or were, in the trade, and who frequently have made purchases. The defendants' witnesses all speak of the price, during the three years in question, as varying from twenty-five to thirty-five cents per hamper of about one and a half bushels. Some of complainant's witnesses speak of fifty cents per hamper. Mr. Ruckman claims to have paid a much higher price; but the decided weight of evidence fixes the range of prices, delivered alongside of freighting vessels, as given. Nearly all the witnesses speak of the cost of raising them from the beds and preparing them for delivery to the vessels, as ranging from five cents to fifteen cents per hamper. From all the testimony,

I conclude that the highest price given by the defendants' witnesses may be adopted as the value alongside of vessels, and that the lowest price named by them for raising and preparing for delivery to the vessels, should also be adopted. This will show the value in the beds to be thirty cents per hamper of one and a half bushels, or twenty cents per bushel. This seems to me to be as large a price as the evidence, taken together, will justify, and will entitle the complainant, for his one-half of the quantity found as above, at that price, to be the sum of $2,300.

I have had doubts whether this court, in the exercise of its equitable discretion, should allow to the complainant interest upon his claim prior to March 29th, 1869, the time when he filed his bill against the Deckers. They received this property from Wilson as that which Wilson had bought for them and paid for with their money, and under the belief that it belonged to them. No demand was made upon or notice brought to them, by the complainant, of any claim against them on that account until about the time of filing this bill. Mr. Ruckman knew that, from 1856 or 1857, this property of Wilson and himself was upon these beds, if not disposed of by Wilson, and must have known the fact established by the evidence in the case, that if not disposed of within four or five years, that it would become valueless to him; yet he seems to have made no diligent inquiry to ascertain the condition or disposition of his property until he became involved in litigation with Wilson about other matters. The defendants lost whatever opportunity they might have had, during all this time of delay, for obtaining redress from Wilson. Because of what I regard as great laches on the part of the complainant, I reluctantly yield to a claim of interest, which, in amount, exceeds the principal sum.

I have computed the interest on $400 from May 1st, 1858, and on $1,900 from May 1st, 1859, at the rate of six per cent., to May 1st, 1866, and from that time to December, 1877, at seven per cent., finding the amount to be $2,338.58,

which, together with the principal, makes the sum of $4,238.58.

The decree in the cause should be reversed, and a decree entered for the complainant for the sum of $4,238.58.

Decree unanimously reversed.